The next case on the docket is Kent Renshaw v. Dirnbeck and Dave Thaubill. I want to state for the record that the parties had made a motion for an extended amount of time, and the court granted that motion, allowing 30 minutes for each side with 10 minutes for rebuttal. And there was another motion to dismiss the cross appeals, and an order was entered on that case, taking the motion with the case. So, subject to that, I'd like to begin. Thank you, Your Honor. My name is Lane Harvey. I represent the appellant, Mr. Renshaw. This case arises out of the Democratic judicial primary in the Second Judicial Circuit held on March 20th of 2012. At the Second Judicial Circuit, the race was for the at-large circuit judge in 12 counties. On April 20th, Mr. Dirnbeck was certified as the winner of that primary by 42 votes. There was no Republican candidate filed in that primary. There was a discovery recount conducted for some of the statute on May 8th, and prior to that, on April 30th, a contest was filed by Mr. Renshaw seeking to recount the votes in Franklin County. The case was decided by the trial court on motions for summary judgment. The issue in summary judgment was whether or not the discovery recount had indicated enough vote change that it was likely that a recount of the entire county would change the result. The court determined that, as a matter of summary judgment, that there had not been enough votes changed in the discovery recount that would meet the test for recounting the entire county. The statement of facts lists specific categories of voters upon which the trial court ruled. In ruling against Mr. Renshaw, the trial court determined first that voters who had moved and had not changed their registration but had stayed within the same precinct were legal voters. The trial court ruled that voters whose address had been changed by reason of the implementation of the 911 emergency telephone system, but who had not filed a requisite statutory affidavit, that their votes would be valid. The trial court ruled that voters with incomplete addresses were valid. The trial court ruled that voters with incorrect addresses on the registration materials were valid. The trial court ruled that voters without registration affidavits were valid, and that voters with no registration cards were valid. We have challenged each of those rulings as being contrary to the terms of the registration statute, Article IV of the Election Code. It is from the summary judgment that the court entered based upon those findings that this appeal is taken. The first point to be made, Your Honor, and a fundamental point that carries through all the issues in this case, is that in order for any voter to have his vote legally counted, the voter must meet two, not one, two conditions. First, the voter must be eligible as defined by the Constitution and by statute. That isn't where the inquiry stops. The voter must also be qualified to vote in order for the vote to count. There are two places of reference that are relevant in this case where these things ought to be examined. The first is in Article III of the Illinois Constitution. Article III, Section 1, defines the qualification of a voter. The article also, immediately below the definition of qualification, delegates to the legislature the specific right to enact registration requirements to determine whether the qualified voter is eligible. In Article III, Section 4, the Constitution specifically delegates to the legislature the right to determine the residency, what constitutes a residency, for purposes of qualification and registration. So, the Constitution clearly delegates to the legislature the right to determine eligibility requirements for an otherwise qualified voter. Significantly, in Article III, Section 5, the Constitution creates the State Board of Elections for the specific purpose of supervising these requirements. So, that's the constitutional provision that governs in this case. There is a statutory provision that relates directly to primary elections. It's found in Section 7-43. In 7-43, the first paragraph defines who is qualified to vote in a primary election. The qualification is essentially the same as in the Constitution. But if you look at sub-paragraph F of that same statute, one of the conditions in order for a qualified voter to be able to vote is that there must be registration in accordance with Articles 4, 5, or 6, whichever is applicable to the place where the primary is held. As a condition for the vote. So, again, the statutory determination of who may vote in a primary election requires first, qualification, but secondly, eligibility. One of the things that is apparent in this case is that both the appellees and the trial court concentrated extensively on qualification, but in no real sense ever addressed eligibility. There is no provision in Illinois law, whether it's constitutional, statutory, or decision, that alleviates the requirement that the voter be both qualified and eligible. And the court's attention is directed first to Section 4-1 of the Illinois Election Code. That's the portion of Article 4 which addresses counties of less than 500,000. That's the portion of the statute which governs this case. What that statute provides is, and I quote, "...except as provided in this Article 4, it is unlawful for any person residing in a county containing a population less than 500,000 to vote at any election at which any officers are denominated for election or at any election at which questions of public policy are voted on unless such person is, at the time of such election, a registered voter under the provisions of this Article." Now, we have maintained, in accordance with the Illinois Supreme Court's decision in Cuddhill v. Reynolds, that the registration requirements are mandatory and they admit of no exceptions. I would refer you to the Cuddhill case decided in 1944. I would note that the current Article 4 was enacted in 1942, so at the time this article was enacted, this is the case in which the Supreme Court first had occasion to address it. In Cuddhill, the question, the overriding question in the case is whether what it refers to as the Permanent Registration Act, which is now Article 4, as to whether it was directory or mandatory. We have cited, as I'm sure Your Honors may have noted, we have cited language from the Cuddhill case fairly extensively. Significantly, that language has not been addressed by either appellee in any realistic way. The registration requirements are mandatory. Well, let me ask you about that later. There's no question that Cuddhill has not been reversed, has not been specifically reversed by the Supreme Court. The Supreme Court did issue the Pullen case, and part of the Pullen case says that to determine whether something is mandatory or directory, you look at the specific language. It seems to have had a set up almost a values clash in the statutory scheme. Can you direct us to the language in that section that would indicate the section is mandatory? Otherwise, Pullen seems to say the default position is that it's directory. Your Honor, I basically disagree with you on that because the Pullen case does not address, in any sense, voter registration. Oh, there's no question about that. But as a general policy pronouncement, it seems to indicate that if it's not, as to my particular question, if it's not mandatory, it's directory, and you look to the language in the statute to determine that. And my point to Your Honor is this. First of all, as I said, I think the Cuddhill case addressed that quite specifically. The Cuddhill case says, in just these words, the voter has no discretion, period, end of story, no exception. Secondly, if you look at what the Supreme Court in DeFabio said about Cuddhill, or excuse me, Pullen, what the Supreme Court in DeFabio said about Pullen is it's pretty well restricted to its facts, and its applicability is limited. The other thing that's important here is that Cuddhill distinguished, as a completely different category of things, the provisions in the statute which may deal with handling votes after they're passed, as opposed to the pre-election conditions of registration. The rationale for Cuddhill in doing that was you can correct registration at some point. You can't correct whatever may have happened with the votes after they're passed. They differentiate between the classifications. So the point, I think, is that registration, not whether or not in Pullen some ballot had the right precinct written on it, or whether some election judge, as in Pullen, put the ballot in the wrong box. That's a different category of things than the basic registration requirement imposed by Article IV. Article IV doesn't say in Section 1 that a vote is lawful, that no vote is lawful unless you're registered in this article, except. Indeed, Judge, if you look at the jurisprudence of the state of Illinois, since Cuddhill has been decided, there is no decision, no decision, no legislative amendment, nothing, which has ever suggested that any provision of the Registration Act is less than mandatory. Indeed, the Cuddhill Court had occasion to consider the question Your Honor raises, because in the Cuddhill Court, if you look at page 349 and 350 of the official site of the Cuddhill, the Cuddhill Court noted that, well, you know, there are those who say, maybe we ought to grant what the court referred to as some leeway regarding registration, because, you know, if we enforce it strictly, there may be some folks who don't get to vote in an election. After noting that was the argument, the Cuddhill Court categorically rejected it, and no case has ever said that, and there is nothing in Pulley that says different, because Pulley could not have addressed that issue, because Pulley never addressed registration, and registration is in a different class, according to the Cuddhill case, than what Pulley was dealing with, and that is what election judges did with ballots after voters cast them. And I would submit to the court that the claim that there is any relevance for Pulley, particularly in the face of what DeFabio said about it, and in the face of the issues in this case that are distinct, because we're not talking about the marking of a ballot and what an election judge did with a ballot here, we're talking about whether the voter was properly registered, and I submit to the court that simply there's no basis to conclude anything other than the provisions are mandatory. I would also point out to the court that there is no authority cited by either act or either in this case that would reach a different conclusion, so I submit to you that it is instinctive that the mandatory, that the requirements are mandatory, and the only case which has addressed that issue is Cuddhill, and I submit to the court that Cuddhill controls. Now, there are, one of the things that Cuddhill indicated, one of the things that I think are important that needs to be considered in the course of this, is while it may well be that one is qualified to vote, or it may well be that the right to vote is fundamentally important, the Cuddhill case and any number of other cases said that that right to vote is not inalienable, and what it said is that that right to vote is contingent upon compliance with the eligibility requirements imposed by the legislature, in this case, in article four. The court noted, there are a number of courts in this state that have noted, that if enforcing that law costs voters the right to vote in a particular election, that's a price worth paying. I would refer you to the appellate court case in Stein, cited in page 16 of our refinery, in which the appellate court said, the argument is made that if the residents look upon the manner we suggest, a citizen may be deprived of his right to vote. Certainly this may be true, but we see nothing inherently evil about this. The right of a voter to express his will in the polls is not an absolute right. The legislature unquestionably has the right to prescribe reasonable conditions upon the right to vote, including conditions of residency. Indeed, that's precisely the delegation of power of the Constitution. The Supreme Court in the Scribner case, cited in page 1516 of our refinery, noted that a voter may lose his right to vote by moving across the county line or across the street. So the requirements are mandatory. Now, in this case, particularly in categories E, C, D, and E, detailed in our statement of facts, the trial court ruled that the fact that the voter's registration address is not the same as the voter's vote somehow or other doesn't disqualify the voter. My submission is that that simply is an incorrect statement of the law. If you look at the statutes, article four, there is a consistent statutory pattern which very clearly requires, as a condition of voting, that the voter's registration address, the voter's registration data regarding where he or she lives, must be the same on election day as it is on the registration material for the right to vote is forfeited. I would start with... Let me interrupt you there. Group E, which had the... I'm sorry, group F, which was referred to as no affidavits. Yes. Those were people who showed up at the voting poll and did not have a valid registration card and did not sign affidavits. Is that correct? I believe that to be correct. Is that the same category of voters that was denied in the top ten cases? Is there any difference between those people, those 22 ballots? Well, I think, Judge, if you look at the record of the case, you'll find a couple of things. First of all, there was no voters affidavit on file. If you look at Section 410 of the Act, in order for a voter registration to be valid, two things have to coexist. The first is there has to be a voter registration card. The voter registration card has the data defined in Section 480. Section 410 then requires that, in addition to the card, there be the voter affidavit. And if you look at the last part of Section 410, 410 says that those two things taken together are the voter's registration. What we're saying with the F is that affidavit is not present. And it's not what they claimed in the Tuttle Hill case, that that affidavit was not present. In the Tuttle Hill case, Judge, and I have to think about that for a minute, but what the Tuttle Hill case says is the entirety of Article IV is mandatory. And I don't recall... Well, I was looking. The voters in this particular group did not claim an acquired affidavit or did not complete their registration card. That's correct. And that's part of Article IV, which Tuttle Hill says is mandatory. I don't recall... They did not allow them to vote. I believe that to be correct. I'd have to go back and look at the specific issues on that. But the point I make about Tuttle Hill is Tuttle Hill makes no exceptions for that. Now, I want to look at the statutory scheme, which is consistent through a number of sections of the statute, that in order for a voter to be allowed to vote, the voter must provide and have his registration address be the same as the address of his permanent voter. We start with Section 4A. The Section 4A, which defines residence, is very specific. It says that the name, street number, the avenue, location, dwelling, including the apartment, unit, or room number of any. And in the case of a mobile home, the lot number. And such additional, clear, and definite description as may be necessary to determine the exact location or dwelling of the applicant. No exception to that. I then would direct the Court's attention to 416. The third paragraph in Section 416 provides that if a voter moves within the same precinct after the voter registration books are closed, but before the election, the voter's right to vote is conditioned upon the voter signing an affidavit reporting that move. And that report then is treated as a re-registration. But there is no right to vote absent the execution of that affidavit. And that includes, specifically in the language of 416, moves within the same precinct. My submission to the Court is there is no reasonable argument as to why it is a condition to vote if you move within 28 days of the election. Or 27 days of the election. And you have to, even if you move within the same precinct, you have to report it. Plus the rationale for saying you don't have to if you move 28 days before the election. Or 30 days before the election. Or three months before the election. The clear legislative intent is that even if you move within the same precinct, you have to report the move of changing your permanent abode to the election authority. If that's not enough, look at the paragraph just below that in 416. The fourth paragraph. In that paragraph, the county clerk has given the election authority, in this case the county clerk, has given specific authority to obtain information from third parties like the post office, like the utility folks. And if that information suggests to the county clerk that the voter is no longer eligible to vote from his registration address, he's stricken from the role. And there's no exception in that paragraph that says, oh, unless he still lives in the same precinct. If he is not registered, he's not entitled to vote from the address in which he's registered, he's stricken. The clerk sends him new registration material. It's a clear expression of the policy intended by the legislature. Next, I would direct your attention to section 3-1. Section 3 is incorporated in Article 4 by Section 4-2 because it incorporates Article 3 with regard to residence. In 3-1, small 3i, there is a specific requirement imposed upon those whose legal address has changed, although their fiscal location doesn't, because of the implementation of 9-1-1. And what 3i says is, if you're residing in or registered to vote from the election district 30 days next preceding election, there, have not moved to another residence, but your address has changed as a result of the implementation of 9-1-1, your right to vote is conditioned upon your subscribing and affidavit in Form 74-1710A, which provides your new legal address. There's no exception to that because you're in the same precinct. So throughout the statute, there is repeated references to the specificity of the requirement of your residence for registration. There is no provision in the law in any case which says that if you change that residence and you don't report it, you get to vote for state offices. What's the legislative rationale or legislative intent in consistently, through the statutory enactments, the legislature focuses, uses the language of the precinct? Well, what the legislature does, and I suspect we've got a distinction here. The distinction is this. Obviously, the eligibility requirements require that you live in the precinct. And one of the things that we've addressed in our brief, and I think you may have had the opportunity to see this, is there are two levels of oaths that the voter has to take. Before the voter ever gets to the place where the voter can say, well, yes, I've lived in this precinct for 30 days, the voter has to first swear to where he lives, to where he lives. The illustration that that's a precondition for voting is 416. Because 416 says if you move, after the votes are closed, if you move within the same precinct, we condition your right to vote on signing the affidavit that provides your new address. So, the qualification requires that you be in the precinct. The eligibility requires that the address that you have provided on registration is, in fact, where you live. And I don't think there's a question about that. And if there is any question about that, I simply would refer you to 26 Eleanor Administrative Code 216.9. Now, again, that's enacted by the State Board of Elections. The State Board of Elections, as I mentioned, is created by the Constitution for the purpose of overseeing it. And what the State Board of Elections says is if you move within the election jurisdictions of the county and you don't report it to the election authority's firm, then you can only vote for federal offices. Well, I think we can note that, judging the Second Judicial Circuit, it's not a federal office, first. Second, you will note that there's no exception if you move within the same precinct. And third, you need to look at the context in which this was enacted by the board. If you look at the Federal Voter Voter Law, and we've cited this in our brief, the Federal Voter Voter Law says, well, you know, if you move within the precinct, and it talks about the polling place, if you move within the precinct and you haven't reported it, and you come in and you have to mention to the election judge that, oh, well, I know you got moved from one side of the street to the other or whatever it is, but I'm still in the same precinct, then you can go ahead and vote for the federal offices. The State Board of Elections, in enacting 216.90, specifically rejected that. And the point of this is that the federal statute, by its terms and under our federal system, is limited only to the election of federal offices. So the reason in the 216.90 that they said you vote in federal elections only is because the federal statute sets the qualifications and eligibility for the federal office, but it cannot for state offices. And you can't do it. In this case, the trial court erred in making those rulings that these people whose addresses are not their registration addresses could vote. One other question. I'm sorry. I do have a question. One other question. I know you didn't get to it. If your position is that correctly done, the results of this should be extrapolated to the county, the Franklin County. Yes. Since this is a 12-county circuit, why wouldn't it be extrapolated to the other 11 counties? I mean, they talk, elective district can be a term with some plasticity, but you're talking about a circuit-wide judgeship. Yes, and the reason, the answer to that, and we've gone through this to some extent, I don't agree. Right, I'd rather you agree. And the answer to this is specific. First, there is a distinction between a primary election and a general election. Decisions of this court and other courts in this state that we've cited draw that distinction. Sure. Secondly, the primary statute which governs this, 763, governs contest in primaries. 763 says that even in multi-district, multi-county districts, the challenger can file in any county that he chooses to challenge. That's what we did. Third, the specific language of the statute says that the appellee, in this case Mr. Garneva, can file a, quote, counterclaim, as in other circuit cases. And for the reasons that you've seen in our brief, Judge, counterclaim is a defined term in the law. And what the trial court rule of the fact is, is he's limited to filing a counterclaim, either against the plaintiff or another defendant. Finally, look at the primary election contest statute compared to the general election contest statute. In 2323, which is the general election contest statute, there is specifically included a right for Mr. Dernbeck, for one, Mr. Dernbeck's position, to seek a recount in any other precinct, any other county, or all the other precincts of all the other counties, that the contestant doesn't designate. That language is not included in the primary statute. Had it been the legislative intent that Mr. Dernbeck would have the right to challenge in all of those other counties, that language could easily have been included. But because of the distinction drawn by the cases between primary elections and general elections, and because of what is typically the necessity of expediting primary elections, that right is precluded, excluded. The statutory language and the juxtaposition between the general election statute and the primary election statute in that regard, I think, make the point clear. I hope I've answered your question. You have. Thank you, counsel. Thank you. Mr. Cox? You'll be afforded a few extra minutes. Thank you. And, first of all, may I please support my counsel? Mr. Owens and I have decided to divide our time up, so we both have an opportunity to speak. And disgracefully, he allowed me 25 minutes and only preserved five for himself. And I appreciate that. I'd like to begin by addressing Judge Goldenberg's issue, because I think it's at the heart of this case. There's a unique circumstance that occurred here. There are 12 counties. My client, Eric Dermack, got the most votes only in one county, in Franklin County. Mr. Renshaw exceeded him in votes in every other county in this circuit. And what that means is the only possible way for Mr. Renshaw to prevail in this case is for the court to impose the heightened, very strict registration standard, but only impose it on Franklin County voters. Here's the reason. Because if we impose the same heightened standard of registration perfection that's requested here in registration, if we go to the other counties and begin imposing that standard there and invalidating votes there, all of those votes are going to inure the benefit of Mr. Dermack. And we see in our power claim we've listed specific voters. And what we see is that if we impose the same standard on those voters in those counties, Eric Dermack, just in a few counties, has increased his vote total by 395. It is mathematically impossible for Mr. Renshaw to win this election if we impose the same standard on voters in all 12 counties. Just impossible. What makes your position a counterclaim as opposed to a third-party claim, as your opposing counsel has argued? A third-party claim requires that you are trying to impose liability on another party. Let me turn to that section. And we see that in those cases where you are trying to impose liability on another party, you bring that party into a third party. A counterclaim is really a set-off. Here, we are not trying to impose liability on any other party. That is, we have to bring the county clerks in because they're necessary parties. They hold the materials. Instead, what we're doing is trying to offset the votes that Mr. Renshaw has increased, not enough in this case, but has increased in Franklin County. We're trying to offset those votes with invalidated votes in other counties. That's a counterclaim. You're offsetting one against the other. A third-party claim, by definition, requires that there be an attempt to impose liability. In fact, when we look at Section 2-406B, which, of course, you remember from the Civil Practice Act, it's by bringing in a person who is or may be liable to him for all or part of the claim's claim against him or her. We don't have that case. We don't have the shifting of liability that you would see in a third-party claim. What is the counterclaim? The counterclaim is that we want to be able to do what Mr. Renshaw did in Franklin County in the other counties. That is, if the standard adopted by the court is, as Mr. Renshaw says, this perfection requirement in registration, then we want to, as part of that process, look at the votes in other counties. Now, since Mr. Durbank was the winner, he was not permitted the opportunity to bring an election contest. What we want to do is to offset the gains Mr. Renshaw may make in this county, and by imposing the same standard in the other counties, when we do that, we see it's impossible for Mr. Renshaw to win because in 11 counties, we're going to, by invalidating votes there on the same basis that were invalidated in Franklin County, we're going to see an even greater increase in Mr. Durbank's vote votes. And is there statutory authority for Mr. Durbank to do that? There is no prohibition on doing it. In other words, the access, you can bring a counterclaim, and a counterclaim is a claim by which you set off against what this person is doing itself. Third-party claims differ. The rules for the primary election contest versus the rules for the general election contest would both allow you to challenge the lead votes in the other counties. By counterclaim. It specifically allows a counterclaim. And so in this case, and so let's step forward. Let's say we have, we go back, and the court determines, based on this heightened standard, that we're going to have a recamp. Because where is this stage one? If we get to stage two, there's the actual recamp. Is it recamped only in Franklin County? Can we leave all the other votes alone? Or would we recamp all 12 counties? Judge Bromley in the trial court said he believed we should recamp all 12 counties. It's the only way not to skew the vote. Because if we apply a higher standard to only Franklin County voters and not to other voters, have they skewed votes in an equal protection problem for the voters of Franklin County? So let's take an example. Let's say that under Mr. Renshaw's view of the registration act, I happen to live on South Main Street. But let's say my registration mistakenly said I lived on North Main Street. I don't really live on North Main Street. Through some error, I'm down on South Main Street. So, my vote doesn't count under his view. Now, that means that if I go to Albany, Illinois, and a voter has the same problem there, his or her vote should not count either. Otherwise, they've diluted the vote, they've skewed the vote, but they've treated that person differently than me. The only way to get to the true vote total, which must be the intent of an election contest, what's the true vote total, is to recamp all 12 counties. And when we do that, and we apply the standard, even the standard that he proposes, or the standard that we propose, which is the one adopted by the trial court, which is you have to live in the precinct, we end up with the result that mathematically, Mr. Renshaw cannot win. The only way for him to win is to skew the vote by only recounting votes in Franklin County and ignoring the other 11 counties. That cannot be the intent. Do we have a jurisdictional problem or not? Pardon? Is there a jurisdictional problem? In what sense, Your Honor? In bringing the other counties in. No, there is not, if we're permitted to bring them in as a counterclaim. Now, keep in mind... Have they been named in the county court? Pardon? Have they been named in the counterclaim? The county courts have been named simply because they are a necessary part of the compulsory material. We've not added any other candidates or anything like that. I'm going to stand up, so excuse me. I understand, but you've held out pretty long. Excuse me, you've posed a lot of your argument in terms of clashes standards, so let me get to that question. Yes. Okay, I've got a blank here. You rely on Paul, essentially, as to the degree of specificity, strictness, whatever, of the standard. I know Trenthill is an older case, but it's pretty absolute in its terms as far as what is mandatory. Can you cite any authority to this court, even statutory authority or case authority, that would indicate that Trenthill has been refined somewhat as far as the degree of specificity, the mandatory nature of the pronouncements that it made? Poland does focus on a different factual situation, but it has pretty clear policy pronouncements, as does Trenthill. I know both of you cited a bunch of cases, but could you sort of boil that down and refine that? Any cases or subsequent to Trenthill's statutory enactments that would indicate that the Trenthill court's pronouncement as to the mandatory nature of these provisions has been refined, vacated, trimmed, gutted, whatever term you'd like to use. Thank you for that question, because that's exactly what I wanted to talk about here. Let me begin by talking about Trenthill. You know, what Mr. Renshaw's counsel is saying is Trenthill stands for this proposition, that if your address is not the same on your registration card as when you vote, your vote doesn't count. Trenthill is not even close to saying that. Let me talk about what Trenthill really said and what Trenthill really did. Trenthill was never concerned with the question of the accuracy of your registration card, which is their entire argument. They never addressed that issue. The issues they addressed, for example, and we talked about this in the brief a little bit, I did provide an analysis of Trenthill. Let's take, for example, Mose and Edith Miller. And what they did, they moved to Jackson County temporarily, took a lot of their household effects, and then eventually they came back and left some over there. And this is what their vote counts. They didn't address whether they were living in the same house, they didn't care for registration cards, etc. What they were concerned about in Trenthill is did Mose and Edith Miller intend to reside in the precinct in which they voted. The Trenthill court was concerned not about the absolute accuracy of the registration card, they were concerned about is there fraud. In this case, there's no fraud, no allegations of fraud. They were concerned about, in Trenthill, you would live in a precinct in which you voted. The voter, they said, must reside in the precinct in which he or she votes, which is the standard and the regional standard imposed here by the Toronto court. But in that example, there was no discrepancy in the voter card. There was no error. It's just that's where they claimed they lived. The issue there seemed to be residency. Residency was part of it, but there was no analysis of whether or not the registration card was correct, and we don't even know that they moved back to the place they were before. We don't know that. Most of their argument is based on errors in the registration card. And I do want to address that section half of the no affidavit. That's the motor voter group. That's they raised her in the alternate method of the motor voter, which was not even an issue that was raised in their pleadings. It was raised on the third day of trial, and we objected to that coming in so late. But that's what those are with motor voter. But when we look at Tavio, we see that the person that they did eliminate or invalidated the votes, Lady and Barbara Tripp, and Ms. Tripp did not live in the precinct and was not registered at all. Every voter in this case that they now see by this appeal invalidated. It's a registered voter. The question is, is their registration perfect? In other words, have they listed everything that they should list in their registration? No case, no court has ever gone that far. No court, including Tavio, has ever said, if your registration card is not exactly perfect, your vote doesn't count. To what degree does mandatory mean in the Tavio case? Well, mandatory was further re-fired by the court in Poland. And Poland has some different facts as well, but what they did provide us was a wonderful, clear definition of what's mandatory, what's direct. The default position is it's directory. In other words, the default position is it's directory unless there's a specific statement that if you don't do this, your vote doesn't count. In other words, the voter has to be warned, if you don't do this, your vote doesn't count. Because mandatory is like voter debt. Your vote doesn't count, you're invalidated. The voter has the right to know that. No place does it say, well, let me add one more thing. The other thing that Poland did that was great is they said, shall is counting shall. Shall, what shall means is we really want you to do this, but if you don't do it, it doesn't invalidate your vote. And when we look at Poland, let me grab that case here real quick, you see that they didn't say it. The voter is to sign a registered, a vote, a certificate of registered voter at the time of voting. And they said, well, okay. But even if you don't sign that, and they didn't say shall, we're going to let your vote count. In other words, not everything we say shall is mandatory. Mandatory is a category of things that if you don't do them, you're disenfranchised. And they must be things that go to the heart of the process. In other words, something that would, if not done, would affect the integrity of the process. And you take some of the folks that live in Royalty related to disenfranchised. It says North versus South. It says 3-2-1 instead of 1-2-3. There's nothing about that registration that's going to affect the integrity of the process. Because what affects the integrity of the process is somebody coming from another precinct and trying to vote in this precinct. Which was the concern with Barbara Tripp and the Tugwell case. So POTA was very valuable to us in that it refined the definition of what mandatory was. Made it clear, the act has to say if you don't do this, your vote doesn't count. And it also said, even though it says shall, we are still going to give some leeway. And they said something here that I think is important for the court to know. That is, the general purpose of all election laws is to obtain fair and honest elections. And this end is paramount in importance to the formal step prescribed as a means to its achievement. And that is so true of you. Because what we have here is an attempt to skew this vote by limiting it to Franklin County. Imposing a draconian perfection on registration that no one is going to be able to meet. And we know that because when we look in the other counties, we see the same problems there that are in Franklin County. They're just part of the system. So are we going to start disenfranchising large groups of people who do not have perfection in their registration? I don't know who I've spoken to in North, South, East versus West on their registration. Who knows? We don't. But I know they've lived there for 50 years. And they deserve the right to vote. And their vote should count. So if we look at Toshio, we do not see any place there where it says that if your registration is not perfect, your vote doesn't count. It never goes that far. But that's what they wanted to say. This court would be the first court who has ever held that level of scrutiny on the Board of Registration. It really goes against the whole purpose of this. We all go vote. When I go vote, I walk into my precinct. Those people know me. Founder kids. They know me. And the same is true in all these little precincts. If you, whether you move or not, now if I move to a different precinct, they may not know. They may not know where I am. They may not know that I walk out of the car, I'm driving. They know all that stuff. So there's a big difference between living within the precinct and living outside the precinct in terms of the integrity of the process. Mary? The Tuckville court does go through and talk about the duties of the clerk to get it right. And they do say that it's the clerks that have the opportunity, at least, to correct mistakes. And that their duties are mandatory. And you keep saying there's no language in the Tuckville case that says they have to have the correct address. Well, the requirement of a mandatory duty on a clerk to get it right is not the same thing as what you're arguing? I'm arguing that a clerk may have a duty to get it right, and certainly we want the clerk to get it right. But is that the same as saying you should disenfranchise that voter? We don't know who put these verses west, but we do know that these folks have lived in Washington all their life and voted for 50 years. Why should they be disenfranchised? Because of a problem the clerk may have had. And that's the sort of thing that's troubling here. In other words, they take Tuckville and they use it to impose upon a voter a level of perfection that is really not realistic. And the question here is, should we disenfranchise that person for some scrimmage error? Should we not allow their vote to count? And, moreover, should we take the process of an election contest and manipulate it in such a way that we use that standard to disenfranchise voters here but not apply it throughout the whole circuit? Again, that's the only way Mr. Randolph could possibly do it. I should mention that the standard that was imposed here by Judge Barone in the top court, which is you just must live in the precinct in which you vote, satisfies the concerns against fraud and having fair elections, so that you know the person just voted in the precinct in which they live. And every one of these voters voted in the precinct in which they live. And how do we know that? How do we have confidence in that if there are no affidavits reporting it? Well, there are affidavits about that in the record. And Judge Barone disenfranchised every voter who did not live in the precinct in which they voted. The only ones left in this appeal are those who actually lived in the precinct in which they voted, because he took all the rest of them out and gave those to Mr. Randolph. So we know that the voters before you are all those who reside in the precinct in which they vote. Do you think an apartment number is an important matter to have on the registration card? No, I don't. It's important in the sense that should it invalidate the vote, it might be a good idea. The purpose of the exemption... Should it invalidate the vote? It should not invalidate the vote. If it's not there, it should be allowed, the vote. Yes, and here's what we're attempting to do with the address. We should think about why do you want to know the address of the person? If I'm going to know which precinct my vote is to be tested, I have to know where you live. Okay? Now, in some instances, if you live on one side of the street, you're in one precinct. If you live on the other side of the street, you're in another. In this case, all the voters we know, as we talked about, live in that precinct. So whether I have an apartment number within the precinct does not go to the issue of which precinct am I voting. And we look at all the affidavits that are required of voters, the affidavits almost uniformly say, I reside in the precinct in which I'm voting. And we've done an analysis of that in the brief. So when we look at the apartment number, does that really help us to determine that? In other words, if I know the address, I know which precinct I'm supposed to be in. The overall concern of the registration process is that you vote in the precinct in which you reside. And we know even one of the two that are trying to disenfranchise are homeless people. And there are provisions for that. The court decided not to. They don't have an apartment to vote. So having an address specifically accurately exact, let's say apartment A versus apartment B, does that disenfranchise you? What level are you going to impose on the voter? I will tell you, when we start imposing a standard like that, we're going to have a plethora of election contests. Because if you lose in an election, a close election, here's what you do. You find the precincts in which my opponent got the most votes and I got the least. And you pick out those precincts, say in one county. And then you say, okay, I'm going to go through every voter registration. If there's any mistake at all, I'm going to get those from them. All of a sudden, I've shown that I'm going to have a lot of votes. Now, if I go to another county and impose that same standard, I'm going to lose votes. So what I'm going to do is I'm going to only impose it on this county. And keep it confined in this area because that's where I can get the most votes. And ignore all the other counties. And what I get is I'm out in the wind. But how did I get there? I skewed the vote. I perverted the number because I'm not trying the same standard. So whatever standard you're applying, and I submit to you that no court has ever gone so far as to impose that kind of exactness in the registration process, we're going to see a tremendous number of disenfranchised votes. And we're going to see a skewing of this election in a way that does not reflect the true intent of the voters. Now, I did want to address one other issue. And then turn it over to Mr. Lomax. If we read being properly registered to mean perfection in your registration, your name's not a spell. Your address is exact. There's no question. There's no fraud. You live in the precinct. But what we're doing is imposing upon you. We're educated people. We're attorneys. We're people that are highly educated. Where I live, there are folks that are not. Maybe they're no longer their own. I mean, we're imposing a duty on people that very much disenfranchises a lot of folks who perhaps... I haven't looked at my registration card in 20 years. I don't know what it says. Is that the standard we're going to impose on voters? Well, let me... I know I've asked you about the cliff between Tuthill and Bowen, but didn't Tuthill impose that standard? No, sir. I do not believe it did. I know there was never a case. As I recall, let me get to Tuthill. As I recall in Tuthill, and I think I analyzed it in my brief, the various objections that were made. The objection, the voter challenges in Tuthill were as follows. An election judge has to give the voter only one ballot, and the judge has to initiate the ballot. No question. That's a mandatory provision, initiating the ballot, as Judge Welch notes. And so that was one. The other one was if the voter receives assistance at the polls, they have to sign an affidavit in necessity of the assistance. But what I'm getting at is your position... I mean, Tuthill clearly says that registration provisions are mandatory. Your position is the polling refined that. Absolutely. With the default position, if it doesn't explicitly say mandatory, it is directory. Aren't these two cases in a clash? I mean, our Supreme Court is a policy court, and you've got a head-on collision that seems separated by a number of years, but in jurisprudence that's somewhat immaterial. Isn't there a clash here? I don't think there's a clash. I'll say this. When you look at what was in issue in Tuthill, when they say that here's what the court said, so far as the voter is concerned, however, if he were to exercise the privilege of voting, the provisions of the statute concerning what he shall do to register are not going to be mandatory. Then we have polling come along and say, we're going to define mandatory for him, and we're going to define it in a way that makes sense. In other words, we look at those provisions that really go to the heart of the process. If I register falsely, I live in a different precinct and I register in this precinct? Yeah. In other words, you must register, Tuthill says, but what polling says to us is what's mandatory, what we mean by mandatory is not that everything is mandatory. They made that clear. Not everything is mandatory. Only those situations where the law says if you don't do this, your vote doesn't count. Otherwise, it's directly taking it out of the definition of mandatory and really refining it in a way that's common sense. In other words, you want to preserve the integrity of your vote, you give the true vote of it in preventing fraud, but at the same time recognizes, I think polling recognizes, there's not perfection in anything that we do. And there's some leeway for imperfection as long as it does not go to the heart of the voting process and to the integrity of the vote. And so I think there is a definite refinement. I don't think it clashes with it. I think it explains it. It explains from the viewpoint of 1990 when polling was decided, it explains a definition that was set two years after the Registration Act came in, back in 1944. And I think that Fort recognized that there has to be some leeway so long as the integrity of the process is maintained. There are a lot of other things we could talk about, but I appreciate Fort's presentation. Thank you. Thank you, Court Counsel. I'm trying to keep my remarks brief. I'd like to bow to my colleague, Mr. Cox, who I thought explained the difference between where we are today with polling and where we might have been in 1944, or I believe it might have been 1927 when the Registration Act was initially put in place by the end of the legislature. I do a lot of criminal law issues. My name is Evan O'Rourke. I'm a state attorney in Franklin County. I've got a lot of duties as a state attorney. One of them is to represent the office, or to represent Mr. Goebel in this case. My colleague, Mr. Austin, is with me today. Mr. Goebel has the obligation and federal duty as a county clerk, and they are a pretty big thing, I think you can imagine, since 1927 in regard to keeping track of voters and new voters and the changes in population and the different avenues, the different changes in the 9-1-1 system, and the different, as municipalities grow, they change their street systems. And that's the society we live in today, a very mobile society. Thank you very much. Mr. Goebel and many county clerk's offices respond for keeping those. And those records are difficult to maintain and difficult to keep accurate counting. However, polling points out clearly that any mistakes on the part of my client, Mr. Goebel, should be held, should be held to disenfranchise the voter. And that's what we have a lot of here. We have some mistakes and entry errors, and as you look at the record in this case, the people that were opposed, they didn't know why their address said North City, instead of South City. These are errors of a municipal officer, which polling clearly states that that should not cause a voter to be disenfranchised. Since my time's up, I'm going to jump just quickly. This is the Constitution. We deal with them all day. We're in the law. You get to see a lot. I read your opinions. If you look at the Constitution, and that's why I bring this up, is why is shall not be shall? Because the shall means shall. In this Constitution, I think, there is no way that these requirements, onerous requirements, would be constitutional. They wouldn't be such. They wouldn't survive strict scrutiny. And that's why shall is a directory, in the case of the Voter Registration Act. If you look at the Constitution, it basically says that every United States citizen who has attained the age of 18, or any other voting age required by the United States, voting in state elections, and has been a permanent resident of this state for at least 30 days, next or preceding election, shall have the right to vote in such and such period. That's the end of the story. Now, it talks about the General Assembly may establish registration requirements. And those are the things that can't collide with that first period, because if they collide with that first period, it's just part of the legislature's behavior. The Constitution says, if you're free from birth, sex, or fetus, you're forgiven, you may come to your home anytime you want. It wouldn't survive strict scrutiny. And even with registration requirements that are so onerous on voters, that when the government changes their address, there's no false hope by implementing a 9-1-1 system, that they disenfranchise. Because we feel, in the United States, our concept of democracy is based on the fact that people who live here have the right to vote, no matter how sophisticated they are. No matter what they know. No matter how poor they are. If you look at the record in this case, if you look at the record in this case, you'll see the most people who are being, tend to be disenfranchised in this case, and some unsuccessful. Judge Cronin did not agree with everything I had to say in this case. I'll agree to that. Because we believe the difference is this whole 12 counties. I understand the precinct concept of keeping us poor here, which is basically what we were doing. But these are people who have lost their homes. These are people who are going through divorce. People who are not sophisticated. That's the overwhelming people who are kind of disenfranchised by this mechanism that Petitioner brings. There are affidavits in every case. There are affidavits. They have registered, they have raised truth. Through the motor voter law, which has been around, I don't know the exact time, but it's been a long time now. A lot of people have been registered to vote, and the state has done a little bit of all throughout the state, through all of the rest of the states in this country, through motor voter law. Relying on that. Voting on that. I believe that, or be it, it's about a two-tiered system. If you're registered to vote, you're voting on the motor voter law. If you're registered to vote, the state votes elections as well. So, this case, again, was a compliant, it was an amended compliant, a second amended petition to the election contest. There were a whole lot of other allegations regarding people's signatures weren't the same, that they went through the absentee system, didn't work out, the color signatures didn't match those on the voter registration card. We've been through a lot of allegations. This extrapolation theory is a dangerous theory in my mind of what we're going to do. I have no statutory basis for how extrapolation works. I don't understand it. I understand the petitioner's concept is that we were to lose voter's right to vote county, so bad, that he'll win. And that's the theory. To hold voter's right to vote county to one standard of registration, when we can go to Cook County, St. Clair County, Madison County, Wayne County, we've probably made examples of this in this 12 counties, which is simply absolutely to lose the vote of these people, of our people in Franklin County versus the whole election district. And that's contrary, that would not survive federal scrutiny under renovation standards. It's literally one man, one vote. Our vote should be equal to anybody in Jefferson County, in Wayne County. But that's what the petitioner's asking the court to do. He's asking us to be at the trial court level and asking us to do what the other courts do here to send us back and just diminish the value of the Franklin County vote. So when it does happen, we come back to Franklin County, please send us the guidance, please send us that we can march our shoulder in every county, we can oppose every voter, that everybody wants to bring up to protest. That's the only way that we can have any fairness in this process. However, we believe that the court correctly, that there were no genuine issues, material facts. They applied the votes the way the petitioner had asked them to do so, when it was the extrapolation period, and he still did not obtain enough votes coming out of Franklin County where he could even show a reasonable likelihood that the results would be different. Thank you very much for your time. If there's no questions. Thank you. Please report. One of the things I would note is an overview. If you may recall that I said the extensive authority, statutory authority, statutory matters, case law examples, you didn't hear any of that from them. The dirt of the law supporting their position gives you a pretty good indication of what it's worth. When you look, for example, Judge, at your question that you addressed to Mr. Cox, as you did to me, why did we get to go outside Franklin County? He says, oh, well, we've got to do whatever, otherwise, we're skewed. This is a statutory cause of action, as we've indicated. The Heck case, Supreme Court case, cited page 79 of our reply brief, defines the term counterclaim in accordance with the Code of Civil Procedure. It is a claim brought by a defendant, Mr. Darnbeck, against either a plaintiff or another defendant, period, end of story. 763 says that they may bring counterclaims as in other actions, other civil actions. Nothing authorizes them to go outside of Franklin County. And you notice that the point that I think is persuasive about this, that they never address, is 2323, in the general election contest provision, specifically authorizes recounts in counties outside the county where the contest is brought. No such authority exists in the statute, and that's the manifestation of legislative intent, and they never address it in either their briefs or in the argument in this court, they never address it. Next, all of this conversation about whether the registration has to be perfect or whatever else they're talking about, and wanting some quote-unquote leeway in the registration, I would direct the court's attention to 387-L-9-350 in the Tuttial decision, the Tuttial court notice, that it is... Excuse me, is this 387 Illinois 2nd? No, it's Illinois, pardon me, Judge. 350, is that Tuttial? 350 is Tuttial, that's the page. The language of the Tuttial, that the Tuttial court uses, it is argued that every voter has the right to express his will at the polls, and the inference is that in order to accomplish this, a certain amount of leeway should be permitted in the manner of registration. That's exactly the argument that was just made to you by Mr. Cox. Here, in the next paragraph, is the Tuttial court's answer. It is clear that no discretion is reposed in the voter by the language of the Permanent Registration Act as to the necessity for his registration in the manner required by the Act. Period. Period. Period. Not except, or not unless. Period. Now, what is the legal basis, then, for the leeway they claim they should have? Indeed, the Tuttial court, again, says, and again, it's at pages 387 and on, 350 and 351, the court says, it is clear that no discretion is reposed in the voter as we indicated before. Then, we are therefore of the opinion that mistakes made by election officials as to registration do not fall in the same category as mistakes affecting the precautionary character of the dues to safeguard the votes of the electors. They segregate the categories. Now, finally, let's get to this point that they make, which is the absolute red herring in this case, that somehow or another, these improper registration addresses are attributable to somebody other than the voter. I would direct you to argument C at page 50 of our brief because, you see, here's the point. The law is, and those testimony is, that in every single case, the voter's address is listed on his registration materials only after the voter signs an oath that that's his address. There's no place, either in the statute or in the practice of the circuit for the county clerk in Franklin County, where somebody just goes in and willy-nilly and says, I'll change Mr. Smith's address. Well, they haven't. Because if the voter wants his address changed, Mr. Doble said they have to come in and sign a paper. When somebody says that their address is mistaken because they live in the South rather than North, the reason it's listed as one to start with is they signed an oath that says that's where they live. That's a matter of statute. That's a matter of practice. There isn't any case in any of these voters that their address doesn't comply with the Registration Act and is anybody's fault other than theirs. Please recall, Tugwell says in clear and raking tones, no discretion is proposed in the voter to deviate from that. How do you say it clearer than that? There is no case in this state in the last 70 years which has addressed that issue in any other way. When Mr. Cox says, oh, my goodness, you know, this is terrible because no other court has ever held what we're arguing. You see, no other court has ever had the question presented to them that you're going to decide today. There is no reported case in this state where this issue has been mitigated. You're the first. The question becomes, first, when Article IV says in order for a vote to be lawful in a county of less than 500,000, there has to be registration in accordance with Article IV. How do you be more clear than that? When the legislature enacts a body of statutes within that article, all of which clearly and consistently say that your registration address must coincide with your permanent vote in order for you to be allowed to vote, where do you hear any rebuttal from that? From me. When Section 416 says if you vote within your precinct within the time after the votes close, but before the election, you can only vote if you sign the affidavit that says you've moved so that the clerk knows, the election authority knows, what your address is. Did you hear them explain why changing the address in the precinct is unimportant? The legislature enacted that statute. They didn't address it at all, and they never addressed it. In the next paragraph, it says the clerk has the authority. He finds out that you don't live at the address you're registered from. He cuts you off the rolls. If it isn't the intent of the legislature that your registration address and your permanent vote be the same, why would the clerk be empowered to do that? Did you hear an answer to that question in any of the arguments that were made here? The short answer is you did not, and the reason you did not is there is no answer. We've talked about polling. Polling clearly. DeFabian says polling is limited to its facts, for heaven's sakes. Polling doesn't address registration. No other case has. Mr. Harkin, it seems that polling addresses the balance. It does. As opposed to the registration. Yes, ma'am, it does. And the balance that has minor technical issues, the polling case clearly says that you have to give a little leeway. That's true. And in the polling case, judge immediately has seen this. You have some of the ballots who weren't printed correctly. They didn't have precinct numbers on them. That wasn't voters' fault. We're not going to hold voters responsible for that. We have some of the election judges, because my recollection is there's two precincts voting in the same polling place. They put some of the ballots in the wrong box. That wasn't voters' fault. That's different. But you see, probably it differentiates between those kinds of things and registration. Is that where your eligibility argument comes in? Absolutely. Absolutely. Because you see, the point is, there is no circumstance in which any of these voters have their registration addressed on the record of the clerk without their first signing off on it. It is legally impossible for the error in address to be the fault of the clerk. We make that argument in the brief, and you know it's never rebutted, it's never answered, and it's never addressed here today. Your job, I submit to you, the task that you face in this case, is you have to decide, first of all, whether the Supreme Court meant what it said 70 years ago. Secondly, whether the legislature, in enacting its statute or so for its specific delegation, meant what it said. If you have no evidence, or all of the contrary. Thank you. Thank you all for the evidence. This matter will be taken under advisement, and the court will be issuing it, of course. The court will hear it temporarily.